U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2022 OCT -5  PM 3: 38

### UNITED STATES DISTRICT COURT
### DISTRICT OF VERMONT

TRACY L. RUBMAN; JAMES )    CASE NO. 2:22-cv-181   CLERK
ELLERY BAKER; KATHY A. )
LOTHIAN, )    BY_____
                       )      DEPUTY CLERK
         **Plaintiffs,** )
                       )    **JURY TRIAL DEMANDED**
                       )
      **vs.** )
                       )
BAYER AG; )
MONSANTO COMPANY; )
BAYER CROPSCIENCE L.P.; )
SOLUTIA, INC.; )
PHARMACIA, L.L.C.; )
PHARMACIA, INC.; and )
PHARMACIA CORP. )
                       )
        **Defendants.**

### COMPLAINT

1.      The Plaintiffs, Tracy L. Rubman; James Ellery Baker; and Kathy A. Lothian, hereby file their civil action against the Defendants as follows:

2.      Plaintiff Tracy L. Rubman is an adult resident citizen of Chittenden County, Vermont.  Rubman is a special education teacher at Burlington High School ("BHS"), Burlington, Vermont, beginning in 2016 and through June, 2022. Due to Defendants' wrongful and tortious conduct, Plaintiff Rubman, throughout the course of her employment at BHS, was exposed to Defendants' polychlorinated biphenyls (hereinafter "PCBs") and has suffered adverse medical consequences, damages, personal injuries, and emotional distress.

3.      Plaintiff James Ellery Baker, Tracy Rubman's spouse, an adult resident citizen of Chittenden County, Vermont. As a proximate, contributory cause of Defendants' wrongful and tortious conduct, Baker has suffered loss of consortium and related damages.

4.      Plaintiff Kathy A. Lothian is an adult resident citizen of Chittenden County, Vermont. Lothian was a special education paraeducator at BHS in Burlington, Vermont, beginning in 2015 and through 2020. As a proximate contributory cause of Defendants' wrongful and tortious conduct, Plaintiff Lothian, throughout the course of her employment at BHS, was exposed to Defendants' PCBs and has suffered adverse medical consequences, damages, personal injuries, and emotional distress.

5.      Bayer AG is an alien entity, based in Germany. In June 2018, Bayer AG paid $66 billion to acquire the stock, assets, and liabilities of Monsanto Company.  For purposes of this Complaint, all Defendants named herein are collectively referred to as "Monsanto." Bayer AG will be served with process through the provisions of The Hague Convention. Bayer AG does business in and directs business activities toward the state of Vermont. Bayer AG knows that the Defendants herein, including itself, have failed to take action to abate, remediate, minimize, publicize, or protect teachers and children in schoolhouses and school facilities in the United States that contain PCBs.

6.      Defendant Bayer Cropscience L.P. ("Bayer Crop") is a foreign limited partnership organized under the laws of the state of Delaware, with its principal office in Delaware. Bayer is registered to do business in Vermont and can be served via its registered agent, Corporation Service Company.

7.      Defendant Monsanto Company ("Monsanto") is a Delaware corporation with its principal place of business in Missouri. Monsanto is registered to do business in Vermont and can be served via its registered agent, Corporation Service Company. Monsanto throughout the course preformed a myriad of transactions over the years, and for the purpose of hiding and/or lessening PCB-related liabilities has been both an active company and a shell company. Monsanto knows

that the Defendants herein, including itself, have failed to take action to abate, remediate, minimize, publicize, or protect teachers and children in schoolhouses and school facilities in the United States that contain PCBs.

8.     Defendant Solutia, Inc. is a Delaware corporation with its principal place of business in Missouri. Solutia is registered to do business in Vermont and can be served via its registered agent, United Agent Group Inc.

9.     Defendant Pharmacia L.L.C. is formerly known as Pharmacia Corporation and is related to Monsanto. Pharmacia is a Delaware limited liability corporation and is a citizen of the states of New York and Delaware. Pharmacia is now a wholly owned subsidiary of Pfizer, Inc. Pharmacia is registered to do business in Vermont and can be served via its managing agent.

10.     Defendant Pharmacia Corporation is a foreign corporation with its principal place of business in New Jersey. Pharmacia Corporation can be served by the managing agent.

11.     Defendant Pharmacia Inc. is a foreign corporation with its principal place of business in New Jersey. Pharmacia Corporation can be served by the managing agent.

12.     Monsanto's chemical operations and businesses have caused indoor and outdoor environmental pollution across the United States, including in Burlington, Vermont and in BHS, consisting of PCBs, dioxins, carcinogens, toxic substances, glyphosate, and other harmful laboratory created chemical compounds.

13.     Monsanto began manufacturing PCBs and/or PCB-like chemicals around the 1930s and continued to manufacture commercial PCBs, including PCBs used in electrical equipment applications and put to several uses and applications in schoolhouses, including BHS, through the 1940s, 1950s, 1960s, and the 1970s. Monsanto acquired Swann Chemical Company in or near

Anniston, Alabama for the purpose of monopolizing PCBs manufacturing, sales, and distribution in the United States.

14.     At some point, Monsanto spun off, or attempted to spin off, some or all of its chemical business to Solutia and/or Pharmacia.

15.     Solutia assumed and agreed to indemnify Pharmacia (then known as Monsanto Company) for certain liabilities related to Monsanto's chemical business. Monsanto, Solutia, and Pharmacia have entered into agreements to share or apportion liabilities, and/or indemnify one or more entities, for claims arising from Old Monsanto's chemical business, including the manufacture and sale of PCBs. Monsanto's insurers have participated actively in this process.

16.     Monsanto, Solutia, and Pharmacia have entered into complex corporate transactions and agreements that determine their respective legal or financial obligations, responsibilities, and claims related to Monsanto's manufacture or sale of PCBs.

17.     In 2003, Solutia filed a voluntary petition for reorganization under Chapter 11 of the U.S. Bankruptcy Code. Solutia's reorganization was completed in 2008. In connection with Solutia's Plan of Reorganization, Solutia, Pharmacia, and Monsanto entered into several agreements under which Monsanto continues to manage and assume financial responsibility for certain tort litigation and environmental remediation related to the chemicals business. For the Monsanto Defendants' wrongdoing that lead to PCB contamination and toxic poisonings at the school buildings in this case, Monsanto, Solutia, and Pharmacia are liable to the Plaintiffs under state tort law. These Defendants may be obligated to one another in contract for PCB tort liabilities as set out in their complex corporate agreements.

18.     Bayer AG bought all the stock, assets, and liabilities of Vintage Monsanto, including all stock, assets, and liabilities relating to PCBs. Bayer AG, as a matter of policy and

practice, controls Monsanto and Bayer Cropscience, which are operated as shell corporations and governed at the whim and direction of Bayer AG's Board of Directors.

19.   Monsanto's conduct is a legal cause of damages to Plaintiffs because the BHS buildings would never have become contaminated with extremely toxic PCBs if Monsanto had not intentionally produced and promoted PCBs in the building construction applications.

20.   Defendants' concealment of the facts concerning PCBs also extends to the manner in which Defendants have defended PCB litigation, and the ways in which they have tried to wash their hands of PCBs without making compensation to victims or making remediation environmentally.

## **VENUE AND JURISDICTION**

21.   The causes of action and many of the facts alleged herein occurred in this judicial district. The place of Plaintiffs' exposure to PCBs is located in Chittenden County, Vermont.

22.   The tortious conduct, wrongful acts and omissions, and the injuries and damages of Plaintiffs occurred in Chittenden County, Vermont.

23.   Defendants committed tortious conduct and engaged in the unlawful activities herein alleged Chittenden County, Vermont.

24.   The amount in controversy exceeds $75,000.00 exclusive of interest and costs.

25.   The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332 based on diversity of citizenship and amount in controversy.

26.   Venue is appropriate in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim is situated in this judicial district.

## BACKGROUND FACTS

27.     Polychlorinated biphenyls, or "PCBs," are mixtures of synthetic organic chemicals comprised of chlorine atoms attached to a double-hydrogen ring (a "biphenyl" ring). PCBs have no taste or smell and range in consistency from an oil to a waxy solid.

28.     PCBs are comprised of many similar semi-volatile chemicals called congeners. A "PCB congener" is any single, unique chemical compound in the PCB category. Over 200 congeners have been identified. *Id.*

29.     From approximately 1929 to 1977, Monsanto was the only manufacturer of PCBs in the United States for commercial use.

30.     The most common trade name for PCBs in the United States is "Aroclor." 21 CFR § 500.45(a) ("Polychlorinated biphenyls (PCBs) represent a class of toxic industrial chemicals manufactured and sold under a variety of trade names, including Aroclor (United States)"). Aroclor is a name that was trademarked by Monsanto.

31.     "Between 1929 and 1977, more than 1.25 billion pounds of PCBs were produced in the United States." Agency for Toxic Substances and Disease Registry (ATSDR) 2014. Case Studies in Environmental Medicine: Polychlorinated Biphenyls (PCBs) Toxicity, U.S. Dep't Health & Human Services, at 21.

32.     "PCBs are extremely toxic to humans and wildlife." *Environmental Defense Fund v. Environmental Protection Agency*, 636 F.2d 1276, 1270 (D.C. Cir. 1980).

33.     PCBs are a "keystone pollutant" and "a prime motivator for the enactment of the TSCA," the Toxic Substances Control Act. "By most accounts, PCBs are the archetypical chemical villains against which the contemporary pollution laws are directed." Rodgers & Burleson, *Polychlorinated biphenyls (PCBs)*, 3 Envtl. L. (West) §6:9 (July 2017).

34.     By the late 1970s, the United States banned the "manufacture, processing, distribution in commerce, and use of polychlorinated biphenyls (PCBs)." 44 Fed. Reg. 31514 (May 31, 1979). This ban remains in effect today.

35.     PCBs are among "the most stable chemicals known and decompose very slowly once they are in the environment… In the environment, PCBs are toxic at low level concentrations to a wide variety of species, marine mammals included. Once PCBs reach the environment, they tend to stay there, or move slowly in damaging cycles…" Rodgers & Burleson, citing in part Response to Exemption Petitions, 50 Fed. Reg. 35,184 (August 29, 1985) (PCBs are also toxic to mammals at very low exposure levels. The survival and reproductive success of fish can be adversely affected in the presence of PCBs. Various sublethal physiological effects attributed to PCBs have been recorded in the literature"); 21 CFR § 500.45(a) ("Since PCBs are toxic chemicals, the PCB contamination of food as a result of these and other incidents represent a hazard to public health.").

36.     "For humans, exposures can cause acute effects such as skin rashes, vomiting, abdominal pain, and temporary blindness and are suspected of causing birth defects, miscarriages, and cancer." Rodgers & Burleson. *See also Solutia, Inc. v. McWane, Inc.*, 726 F. Supp. 2d 1316, 1319 (N.D. Ala. 2010) ("PCBs have been found to cause cancer, decreased fertility, still births, and birth defects in test animals.") (Monsanto cleanup contribution case): *Dickerson, Inc. v. United States*, 875 F.2d 1577, 1579, 1583 (11th Cir. 1989) ("PCBs are highly toxic chemicals frequently used in electrical transformers… Scientists have found PCB concentrations far below those involved in this case to cause cancer, decreased fertility, still births, and birth defects in test animals.")

37.    The *Environmental Defense Fund* decision summarized research available to the scientific community by the late 1970s:

> Polychlorinated biphenyls (PCBs) have been manufactured and used commercially for fifty years for their chemical stability, fire resistance, and electrical resistance properties. They are frequently used in electrical transformers and capacitors. However, PCBs are extremely toxic to humans and wildlife. The extent of their toxicity is made clear in the EPA Support Document accompanying the final regulations, in which the EPA Office of Toxic Substances identified several adverse effects resulting from human and wildlife exposure to PCBs.

> Epidemiological data and experiments on laboratory animals indicate that exposure to PCBs pose carcinogenic and other risks to humans. Experimental animals developed tumors after eating diets that included concentrations of PCBs as low as 100 parts per million (ppm). Experiments on monkeys indicate that diets with PCB concentrations of less than ten ppm reduce fertility and cause still births and birth defects. Other data show that PCBs may adversely affect enzyme production, thereby interfering with the treatment of diseases in humans. Support Document, *supra* note 4. At 9-18.

> EPA has found that PCBs will adversely affect wildlife as well as humans. Concentrations below one ppb (part per billion) are believed to impair reproductivity of aquatic invertebrates and fish. Some birds suffered "severe reproductive failure" when fed diets containing concentrations of only ten ppm of PCBs. *Id.* at 19. Because PCBs collect in waterways and bioaccumulate in fish, fish-eating mammals run a special risk of adverse effects. Such mammals may have "significantly higher concentrations of PCBs in their tissues than the aquatic forms they feed on." *Id.* at 36.

> EPA estimates that by 1975 up to 400 million pounds of PCBs had entered the environment. Approximately twenty-five to thirty percent of this amount is considered "free," meaning that it is a direct source of contamination for wildlife and humans. The rest, "mostly in the form of industrial waste and discarded end use products, is believed to be in landfill sites and thus constitutes a potential source of new free PCBs." *Id.* at 33-34. Other significant sources of PCBs include atmospheric fallout and spills associated with the use or transportation of PCBs. *Id.* at 29.

> EPA concluded in the Support Document that "the additional release of PCBs" into the environment would result in widespread distribution of the PCBs and "will eventually expose large populations of wildlife and man to PCBs." *Id.* at 36-37. EPA concluded further that:

> As a practical matter, it is not possible to determine a "safe" level of exposure to these chemicals. Because PCBs are already widely distributed throughout the biosphere, they currently pose a significant risk to the health of man as well as that of numerous other living things. As a consequence, any further increase in levels of PCBs in the biosphere is deemed undesirable by EPA.

*Id*. at 38. Because "PCBs released anywhere into the environment will eventually enter the biosphere … EPA has determined that any such release of PCBs must be considered 'significant.'" *Id*.

> In 1972, Monsanto, the major American manufacturer of PCBs, limited its sales of PCBs to manufacturers of transformers and capacitors. It ceased all manufacture of PCBs in 1977 and shipped the last of its inventory before the end of that year. Today, PCBs are produced in this country only as incidental byproducts of industrial chemical processes. There are no known natural sources of PCBs. *Id*. at 2.

*Environmental Defense Fund*, 636 F.2d at 1270-71. Most importantly, EPA expressly found that any exposure of PCBs to the environment or humans could cause adverse effects." *Id*. at 1283-84.

38.    In the years following the ban, the EPA confirmed that PCBs are toxic, may cause reproductive and developmental effects, and may cause tumors ("oncogenic potential") in people exposed:

> *Health Effects*. EPA has determined that PCBs are toxic and persistent. PCBs can enter the body through the lungs, gastrointestinal tract, and skin, circulate throughout the body, and be stored in the fatty tissue.

> Available animal studies indicate an oncogenic potential, the degree to which would depend on exposure... Further epidemiological research is needed to correlate human and animal data, but EPA finds no evidence to suggest that the animal data would not predict an oncogenic potential in humans.

> In addition, EPA finds that PCBs may cause reproductive effects, developmental toxicity, and oncogenicity in humans exposed to PCBs. Available data show that some PCBs have the ability to alter reproductive processes in mammalian species, sometimes even at doses that do not cause other signs of toxicity. Animal data and limited available human data indicate that prenatal exposure to PCBs can result in various degrees of developmental toxic effects. Postnatal effects have been demonstrated in immature animals following exposure to PCBs prenatally and via breast milk.

In some cases, chloracne may occur in humans exposed to PCBs. Severe cases of chloracne are painful and disfiguring, and symptoms may persist for an extended time...

50 Fed. Reg. 35182, 35183-84 (August 29, 1985).

39.     The EPA also determined that Monsanto's PCBs are probable human carcinogens. In 1996, the EPA reassessed PCB carcinogenicity based on data related to Aroclors 1016, 1242, 1254, and 1260. The EPA's cancer reassessment was peer reviewed by experts on PCBs, including scientists from government, academia, and industry. U.S. EPA. PCBs: Cancer Dose-Response Assessment and Application to Environmental Mixtures (1996). U.S. EPA, Office of Research and Development, National Center for Environmental Assessment, EPA/600/P-96/001F (1996).

40.     This EPA report found that "[j]oint consideration of cancer studies and environmental processes leads to a conclusion that environmental PCB mixtures are highly likely to pose a risk for cancer to humans." *Id.* at 57. In addition, "PCBs persist in the body, providing a continuing source of internal exposure after external exposure stops. There may be greater-than-proportional effects from less-than-lifetime exposure, especially for persistent mixtures and for early-life exposure." *Id.* at 58-59.

41.     The 1996 EPA report also noted that "PCBs also have significant ecological and human health effects other than cancer, including neurotoxicity, reproductive and developmental toxicity, immune system suppression, liver damage, skin irritation, and endocrine disruption. Toxic effects have been observed from acute and chronic exposures to PCB mixtures with varying chlorine content." *Id.* at vi.

42.     In 2000, the Agency for Toxic Substances and Disease Registry (ATSDR), issued a public health statement regarding PCB exposure. It noted that "[s]kin conditions, such as acne

and rashes, may occur in people exposed to high level of PCBs… Some studies in workers suggest that exposure to PCBs may also cause irritation of the nose and lungs, gastrointestinal discomfort, changes in the blood and liver, and depression and fatigue." Agency for Toxic Substances and Disease Registry (ATSDR). 2000. Department of Health and Human Services, Public Health Service, at 4. The public health statement summarized experimental animal studies finding liver damage, anemia, acne-like skin conditions, stomach injuries, thyroid injuries, kidney damage, impaired immune system function, behavioral alterations, endocrine disruption, and impaired reproduction. *Id.* at 5.

43.    Workplace exposure to PCBs can contaminate homes. The ATSDR statement reiterated that workplace PCB exposure can result in the worker's home becoming contaminated as well: "If you are exposed to PCBs in the workplace, it may be possible to carry them home from work… If this is the case, you should shower and change clothing before leaving work, and your work clothes should be kept separate from other clothes and laundered separately." *Id.* at 7.

44.    PCB exposure causes neurodegenerative diseases. The ASTDR 2011 addendum reported other research "that exposure to PCBs likely has an effect on neurodegenerative diseases for women, but not men," including amyotrophic lateral sclerosis (ALS, also known as motor neuron disease), Parkinson's disease, and dementia. *Id.* at 4.

45.    PCB exposure results in neurobehavioral effects, anxiety. The ASTDR 2011 addendum reported animal studies research "that exposure to PCBs may exert anxiogenic behavior." *Id.* at 5. An anxiogenic substance is one that causes anxiety.

46.    PCB exposure has central nervous system effects. The ASTDR 2011 addendum reported animal studies research showing inhibited and depressed central nervous system effects following PCB exposure. *Id.* at 5-6.

47.     Signs and symptoms of chronic exposure to PCBs can include abdominal pain, anorexia, jaundice, nausea, vomiting, weight loss, porphyria, headache, dizziness, and edema. *Id.* at 56-57.

48.     Animal studies have shown that "commercial PCBs elicit a broad range of toxic responses, including: acute lethality, body weight loss, carcinogenesis, dermal toxicity, fatty liver, genotoxicity, hepatomegaly, immunosuppressive effects, neurotoxicity, porphyria, reproductive and developmental toxicity, thymic atrophy, and thyroid hormone-level alterations." *Id.* at 39-40.

49.     PCBs cause reproductive and developmental effects. "Reproductive function may be disrupted by exposure to PCBs," and "neurobehavioral and development deficits have been reported in newborns exposed to PCBs in utero." *Id.* at 45. Children born to women exposed to PCBs exhibited statistically significant decreased in gestational age, birth weight, and head circumference. *Id.* at 43.

50.     PCB exposure causes endocrine and neurological adverse effects. "The epidemiological studies suggest a link between exposure to PCBs and thyroid hormone toxicity in humans." *Id.* at 46. Adults exposed to PCBs have been shown to have significantly greater motor retardation; poorer results on certain memory and attention tests; and higher scores on standardized confusion scale than did control adults. *Id.* at 51.

51.     The Department of Health and Human Services and the Environmental Protection Agency "consider PCBs a probable human carcinogen." *Id.* at 51. In addition, and "on the basis of sufficient evidence of carcinogenicity in humans and experimental animals, the IARC [International Agency for Research on Cancer] classified PCBs are carcinogenic to humans." *Id.* PCB exposure has been linked to cancers of the liver, gallbladder, biliary tract, brain, stomach, intestinal, thyroid, myeloma (cancer of plasma cells, which can damage bones, immune system,

kidneys, and red blood cell count), non-Hodgkin lymphoma, and the skin, such as malignant melanomas. *Id.* at 48-50. In addition, "data from animal studies have shown that PCBs cause gastrointestinal tract tumors, hepatocarcinomas, leukemia, lymphomas, and pituitary tumors." *Id.* at 50.

52.     Monsanto was well aware of scientific literature published in the 1930s that established that inhalation of PCBs in industrial settings resulted in toxic systemic effects in humans. A 1937 Monsanto memorandum advised that "Experimental work in animals shows that prolonged exposure to Aroclor vapors evolved at high temperatures or by repeated oral ingestion will lead to systemic toxic effects. Repeated bodily contact with the liquid Aroclors may lead to an acne-form skin eruption." Markowitz & Rosner, *Monsanto, PCBs, and the creation of a "world-wide ecological problem"*, Journal of Public Health Policy (2018).

53.     In 1955, Monsanto's Medical Director, Dr. Emmet Kelly, summarized Monsanto's position on PCB toxicity: "We know Aroclors are toxic, but the actual limit has not been precisely defined. It does not make too much difference, it seems to me, because our main worry is what will happen if an individual develops any type of liver disease and gives history of Aroclor exposure. I am sure the juries would not pay a great deal of attention to MACs [maximum allowable concentrates]." *Id.* at 14.

54.     In 1955, the Medical Department at the Aroclors Department in the Krummrich plant in St. Louis recommended that "the eating of lunches should not be allowed in this department." The reasoning was "Aroclor vapors and other process vapors could contaminate lunches unless they were properly protected." *Id.*

55.     In addition, after noting that "the chance of contaminating hands and subsequently contaminating the food is a definite possibility," the Medical Department stated that:

> It has long been the opinion the of Medical Department that eating in process departments is a potentially hazardous procedure that could lead to serious difficulties. While the Aroclors are not particularly hazardous from our own experience, this is a difficult problem to define because early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation. In any case where a workman claimed physical harm from any contaminated food, it would be extremely difficult on the basis of past literature reports to counter such claims.

Garrett JT to Patrick HB, Krummrich Plant; "Department 246 (Aroclors)" (Nov 14, 1955).

56.     A 1957 internal memorandum by Monsanto Medical Director reported that, after conducting its own tests, the United States Navy decided against using Monsanto's Aroclors: "No matter how we discussed the situation, it was impossible to change their thinking that [Aroclor-containing] Pydraul 150 is just too toxic for use in a submarine." Markowitz & Rosner at 15.

57.     Therefore, by the 1950s, Monsanto knew that its PCBs, "Aroclors," are "toxic but the actual limit has not been defined." Monsanto's Medical Director made the reasonable observation that "juries would not pay a great deal of attention" to exposure limits set by the industry. *Id.* at 14. This was reasonable because the exposure limits have not been based on human subject testing. Instead, the industry extrapolated so-called human exposure limits from laboratory tests of small mammals such as rats, guinea pigs, rabbits, and a cat, which have limited ability to report or demonstrate complications following PCB exposure before dying – or being killed – and then dissected for the pathological examination of lesions. *Id.* Regardless of this, Monsanto also knew that "early literature work claimed that chlorinated biphenyls were quite toxic materials by ingestion or inhalation."

58.     In 1967, more professional and scientific journals began paying attention to PCBs in the environment. Markowitz & Rosner at 20. The study conducted by University of Stockholm researcher, Soren Jensen, revealed that "[T]hey found 'a large number of samples' which revealed

that 'polychlorinated biphenyls are found especially in fish and in sea birds …and in some samples

of human depot fat.' It was a troubling revelation that human beings were accumulating the minute

amounts of PCBs." *Id.* David Wood of Monsanto received a letter from a law firm in Sweden

discussing the publicity in Sweden that had been generated by the study. *Id.* Oda Palm quoted a

Swedish newspaper article extensively that condemned PCBs. *Id.* Palm concluded his letter

stating:

> I suppose there is no doubt that what has been termed Polychlorinated Biphenyls is
> equal to Aroclor. There is also no doubt that the published facts will cause
> considerable unrest in several quarters. We probably will have to have Aroclor
> registered with the Swedish Board of Poisonous Substances and the industry will
> have to be particularly careful in handling the material.

*Id.* By the late 1960s, Monsanto had become aware that PCBs were causing widespread

contamination in people and in the environment. *Id.* at 32.

59.     Despite the growing evidence of the harm caused to living things by PCB

contamination, Monsanto remained steadfast in its manufacturing, production, sale, marketing,

and distribution of PCBs. *Id.* at 23.

60.     In March of 1969, Monsanto employee W.M. Richard wrote a memorandum

entitled "AROCLOR WILDLIFE ACCUSATIONS" to Monsanto Employee and Medical Director

Elmer Wheeler. *Id.* at 27. In this memorandum, Richard responded to a 1968 article in *Nature*

criticizing PCBs as being (in Richard's paraphrasing) "a pollutant… a toxic substance – with no

permissible allowable level… [and] a toxic substance endangering man himself, implying that the

[extinction] of the peregrine falcon is a leading indicator of things to come." Richard to Wheeler

Aroclor wildlife accusations. March 6, 1969. Richard also responded to a 1969 article in *Science*

regarding the Environmental Defense Fund's legal strategy, which Richard summarized in part by

writing that:

> These people at EDF are saying we must not put stress on any living thing through a change in air or water pollution. Eagles, plant life, anything which lives or breathes. This group is pushing hard on the extension of the word harmful. They claim 'enzyme inducer' activity is the real threat of DDT and PCBs and are using these arguments to prove that very small amounts of chlorinated hydrocarbons are 'harmful.'

*Id.* Richard also explained that Monsanto could take steps to reduce PCB releases from its own factories, but he cautioned that "It will be still more difficult to control other end uses such as cutting oils, adhesives, plastics, and NCR paper. In these applications, exposure to consumers is greater and the disposal problem becomes complex." *Id.*

61.    In September of 1969, Richard wrote an interoffice memorandum entitled "DEFENSE OF AROCLOR." Richard WR to Wheeler E. Defense of Aroclor-F. fluids. Sept 9, 1969. The memorandum set out Monsanto's general policy on defending litigation against the public: "Make the Govt., States and Universities prove their case, but avoid as much confrontation as possible." *Id.* The memorandum acknowledged that Monsanto

> can't defend vs. everything. Some animals or fish or insects will be harmed. Aroclor degradation rate will be slow. Tough to defend against. Higher chlorination compounds will be worse [than] lower chlorine compounds. Therefore we will have to restrict use and clean-up as much as we can, starting immediately.

*Id.* Based on this, Monsanto knew by the late 1960s that wildlife would be harmed in the general environment, where PCB contamination is low and diffuse – as opposed to PCB contamination in a more enclosed space such as a classroom. The 1969 memorandum also outlined Monsanto's plans for challenging scientific studies of the toxicity of PCBS. *Id.* It also outline Monsanto's own plans for chronic studies using animals. *Id.*

62.    In January of 1970, Elmer Wheeler of Monsanto's Medical Department circulated laboratory results of its own animal studies. The memorandum, made public recently, was entitled "Status of Aroclor Toxicological Studies.". Wheeler E. Medical department, to D.S. Cameron,

Brussels "Status of Aroclor Toxicological Studies" (Jan 29, 1970). Wheeler stated, "Our interpretation is that the PCBs are exhibiting a greater degree of toxicity in this chronic study than we had anticipated. Secondly, although there are variations depending on species of animals, the PCB's are about the same as DDT in mammals." *Id.* (emphasis added).

63.     Monsanto expressed a desire to keep profiting from PCBs despite the research showing PCB toxicity. In the "PCB Presentation to Corporate Development Committee," Monsanto stated that "Do[ing] nothing was considered unacceptable from a legal, moral, customer & public relations & company policy viewpoint." Monsanto. PCB presentation to the corporate development committee (April 1970). However, the alternative of stopping PCB production and promotion, and instead going out of the Aroclor business, "was considered unacceptable from a Divisional viewpoint… there is too much customer/market need and selfishly too much Monsanto profit to go out." *Id.* at 8.

64.     Monsanto formed an internal Aroclor Ad Hoc Committee whose objective, "agreed to by the Committee," were to "submit recommendations for action which will: 1. Permit continued sales and profits of Aroclors and Terphenyls. 2. Permit continued development of uses and sales. 3. Protect image of Organic Division and of the Corporation." Wheeler EP. Monsanto. Minutes of Aroclor Ad Hoc committee, first meeting (Sept 5, 1969). Monsanto set these business objectives despite knowing that PCBs had been found in the environment, wildlife, food chain, as PCBs "may be a global contaminant." *Id.* at 1. In these confidential minutes, Monsanto recognized the problem of PCB "environmental contamination by customers." *Id.* at 3 ("Our in-plant problems are very small vs. problems of dealing with environmental contamination by customers.").

65.     In October of 1969, Monsanto's Aroclor Ad Hoc Committee drafted and issued a confidential report that outlined the depths of the emerging crisis over PCBs. Wheeler EP to

Bergen HS. Jr. and Springate JE. Monsanto (Oct 2, 1969). The committee reported environmental PCB contamination causing the killing of marine species and the possible extinction of several species of birds. *Id.* at 4. In addition, "the committee believes that there is no ~~possible~~ courses of action that can so effectively police the uses of these products as to prevent environmental contamination." *Id.* (underscore and strikethrough in original). The report outlined a plan to protect Monsanto's corporate interests: "There are, however, a number of ~~possible~~ actions which must be undertaken to prolong the manufacture, sale and use of these particular Aroclors as well as to protect the continued use of other members of the Aroclor series." *Id.* (underscore and strikethrough in original).

66.     The committee offered recommendations, including notifying PCB "customers of environmental contamination problems." *Id.* at 7. The basis for the recommendation, in part, concerned reports of PCB environmental contamination and Monsanto's knowledge of the mechanisms of PCB releases:

> It has been recognized from the beginning that other functional fluid uses could lead to losses of the Aroclors to liquid waste streams from the customers' plants. Losses could occur from spills, unusual leakage of large volumes and daily losses of smaller volumes.
>
> It has also been recognized that there could be vapor losses but it has been felt that these were perhaps of less significance than the vapor losses in plasticizer applications. The concern for vapor losses rises from the published proposed theory that even minute quantities of vapors are eventually transferred to the water environment and accumulated therein.
>
> Another possible source of air environmental contamination is the eventual destruction of materials which have Aroclors in them. Of particular significance might be the burning or partial incineration of waste or used products containing the Aroclors.

*Id.*

67.     Despite the environmental damage caused by its PCB products, Monsanto was clearly concerned about losing the production of PCBs and the associated "sales of this very profitable series of compounds":

> The committee recognizes the restrictions placed on those currently involved by mandates to operate within normal or proposed reduced budgets. It should be clear, however, that the product groups, the Division, and the Corporation are faced with an extraordinary situation. There cannot be too much emphasis given to the threat of curtailment or outright discontinuance of the manufacture and sales of this very profitable series of compounds. If the products, the Division, and the Corporation are to be adequately protected, <u>adequate funding is necessary</u>.

*Id.* at 13.

68.     By 1970 the escape, fate, and transport of PCBs into surrounding environments and resulting contamination and pollution was not only reasonably foreseeable to Monsanto, but actually known to Monsanto.

69.     By 1970 Monsanto also knew that its PCBs exhibited a greater degree of toxicity, accumulation, and persistence than Monsanto previously guessed. Despite its unique knowledge, Monsanto chose not to warn its customers and the public regarding the human health dangers of Monsanto's PCBs, instead concealing the same. Monsanto's efforts were and continue to be to focus on protecting its own profits.

70.     An internal secret Monsanto memorandum dated February 16, 1970 provided excuses and active concealment techniques for any discussions outside the Company by any Monsanto representatives with any PCB customers. Monsanto's N.T. Johnson circulated a "Pollution Letter" to a large number of Monsanto employees, in which Monsanto's justification for its subterfuge was that Monsanto "can't afford to lose one dollar of business." *Id.* at 2. To that end, Monsanto stated:

We want to avoid any situation where a customer wants to return fluid… We would prefer that the customer use up his current inventory and purchase [new products] when available. He will then top off with the new fluid and eventually all Aroclor 1254 and Aroclor 1260 will be out of his system. We don't want to take fluid back…

*Id.* at 1. Monsanto put revenue and profits way ahead of human health and environmental safety.

71.     Monsanto went so far as to send this diversionary message to a member of Congress and advised public officials that Monsanto's "PCBs are not used in some of the applications which have been indicated in the public press." Elmer Wheeler to W.R. Richard (May 26, 1969). Monsanto expressed its views to the public, stating: "We cannot conceive how the PCBs can be getting into the environment in a widespread fashion and the company is actively involved in research programs to try to shed some light on the situation." *Id.* at 2. This was a subterfuge.

72.     For decades prior, Monsanto's knowledge of PCB toxicity grew. Despite its knowledge of PCB toxicity, Monsanto intentionally produced and promoted PCBs "for use in a wide range of industrial and household goods, including electrical equipment, paint, sealants, food cookers, furnaces, floor wax, insecticides, lubricants, moisture-proof coatings, papers, asphalt, leather adhesive, and stucco." *City of Seattle v. Monsanto Co.*, 237 F. Supp. 3d 1096, 1100 (W.D. Wash. 2017).

73.     "Though Monsanto was aware of PCB's toxicity and propensity to leach, it denied or misrepresented those facts to government investigators. Monsanto continued to manufacture, promote, and profit from its PCBs." *Id.* (holding that Seattle's claims against Monsanto for public nuisance are not preempted – rejecting Monsanto's argument that intervening acts of third parties cut off proximate causation, because such acts were foreseeable by Monsanto).

74.     Monsanto intentionally failed to warn customers and the public regarding the toxicity and hazards of its PCB products. *Nevada Power Co. Monsanto Co.*, 955 F.2d 1304, 1306-

07 (9th Cir. 1992) ("Nevada Power discovered internal documents of the Manufacturers which Nevada Power contends to show that the Manufacturer's understanding of the dangers of PCBs in the 1960s and early 1970s was much more advanced than the general state of knowledge in the scientific community").

75.    Monsanto's PCBs were not reasonably safe for use in schoolhouse construction because they were unsafe – "extremely toxic" – to an extent beyond that which would be contemplated by an ordinary consumer. The toxicity of Monsanto's PCBs was a proximate cause of Plaintiffs' damages.

76.    Monsanto's PCBs were an unavoidably unsafe product, which was a proximate cause of Plaintiffs' damages, reasonably foreseeable to Defendants'.

77.    Monsanto warnings to the non-Monsanto parties in this case at the time of manufacture regarding the extreme toxicity of PCBs, were inadequate and a proximate cause of Plaintiffs' damages.

78.    Monsanto warnings to pertinent non-Monsanto entity or person in this case after manufacture – and up to present day – regarding the toxicity of Monsanto's PCBs have been inadequate, which was a proximate cause of Plaintiffs' damages.

79.    Due to their toxicity, Monsanto's PCBs never had a "useful safe life."

80.    Monsanto had actual and/or constructive knowledge of the defect and the danger of its PCBs but showed indifference or conscious disregard for the safety of others by producing and promoting PCBs.

81.    Monsanto manufactured PCBs that were incorporated by Monsanto's customers as plasticizers in caulking, paints, ballasts, sealants, and other applications in schoolhouses. In these forms, Monsanto's PCBs were used in interior and exterior windows, doors, and masonry joints.

82.     According to the EPA, even today, caulk containing high PCB levels is still prevalent in school buildings. Thomas, "PCBs in school buildings: sensible steps to healthier school environments", U.S. EPA Office of Research and Development (2014).

83.     PCB-caulking emits PCBs into the ambient air in school buildings, which migrate into the air and nearby materials, including adjoining wood, cement, and brick; air and dust inside schools; soil near school buildings; and other materials and furnishing; and into the bodies of men, women, and children in the buildings, including the Plaintiffs. *Id.*

84.     In several northeastern U.S. schools, 18% of interior caulk/sealant samples had PCBs of greater than 50 ppm, with 6% greater than 100,000 ppm. *Id.*

85.     As stated by the EPA, PCB-caulking and other sealants in school buildings can create indoor air levels above recommended concentrations. In addition, "high PCB levels remain and emissions will continue far into the future." *Id.*

86.     Monsanto's PCBs were also produced and promoted at components of electrical equipment such as transformers, motor start capacitors, and lighting ballasts.

87.     "Commercial PCB mixtures vary from colorless to dark brown oils, and from viscous liquids to sticky resinous semisolids. Although PCBs evaporate slowly at room temperature, the volatility of PCBs increases dramatically with even a small rise in temperature. Equipment that contains PCBs can overheat and vaporize significant quantities of these compounds, creating an inhalation hazard that can be magnified by poor ventilation." (ATSDR, 2014) at 25.

88.     PCB-containing light ballasts were manufactured until the late 1970s. In several northeastern schools, 24%-95% of the light ballasts likely contained PCBs. The "failure and release of PCBs will continue and may increase" in school buildings containing PCB-light ballasts.

*Id.* PCBs are continuously released into the air from intact, functioning light ballasts. *Id.* at 11. PCB ballast can fail, releasing PCB vapors into the air and liquid PCBs onto surfaces. *Id.* "Residues from previously failed ballasts can remain in light fixtures even if the ballast is replaced." *Id.*

89.     There are also extremely toxic chemical byproducts of PCB-ballasts such as dioxins and furans. Failing PCB-ballasts that pyrolyze their PCB contents generate and emit additional toxic chemicals called polychlorinated dibenzodioxins and polychlorinated dibenzofurans. 50 Fed. Reg. 29,171 (July 17, 1985); *Ahrens v. Pacific Gas & Electric Co.*, 197 Cal. App. 3d 1134, 1139, n. 2 (1988).

90.     Gradually over time, school building materials become secondary sources of PCB contamination after absorbing PCBs emitting from the primary contamination sources. EPA (2014) at 12. The EPA even noted that in some cases, secondary sources "may need to be considered for additional remedial actions following removal/remediation of primary sources." *Id.*

91.     For these reasons and others, schools should not contain Monsanto's PCBs. Monsanto knew or should have known that schools were not appropriate for any PCBs nor were PCB's appropriate for compound application, use, or the environment. Monsanto made no efforts to warn BHS, the parents of BHS schoolchildren, or the teachers and staff at BHS.

92.     When a reasonably careful manufacturer learns that its product is toxic and poses a danger to public health, the manufacturer stops producing the product, stops selling it, recalls it, takes remedial measures, such as abatement, and/or warns the public about the product. This should be especially the case when a manufacturer knows or reasonably should know that its toxic products are in schoolhouses.

93.     Despite knowing about PCB toxicity and the danger to public health and the environment and/or of schoolhouse applications, Monsanto did not take responsible measures

outlined in the foregoing paragraph. Instead, Monsanto continued to promote and profit from its sale and promoted uses of PCBs, particularly in electrical applications, as well as conceal from the public the nature of its PCBs, and their ubiquitous presence even in schoolhouses. The only measures that Monsanto took were to destroy incriminating documents, conceal the truth from the public, deploy hundreds of lawyers to assist it in its concealment strategies, and disengage its own employees from any responsibilities or duties with regard to PCBs.

94.     Monsanto recently acknowledged how widespread PCBs are as pollutants from PCB containing products in stormwater throughout the United States. In June 2020, Monsanto agreed to pay $550 million into a common fund to be distributed to over 2,000 class members across the United States. The class members included different cities alleging that Monsanto's design, manufacture, sale, promotion, and supply of PCBs resulted in the contamination of stormwater and other resources. Monsanto thus acknowledged that it was responsible for PCBs in stormwater throughout the United States regardless of the immediate source of the PCBs.

95.     Additionally, Washington state court cases have resulted in jury verdicts against Monsanto for schoolteachers who alleged neurological and physical injuries caused by exposure to PCBs within schools. Monsanto continues to fight against these and other schoolteachers and schoolchildren who have been exposed to Monsanto's PCBs in schoolhouses.

96.     Monsanto did not warn the Plaintiffs or others of the toxicity and presence of PCBs as a public health hazard in schoolhouses, at BHS, or the environment.

97.     Monsanto did not provide the public with warnings, notices, bulletins, or information that PCBs are present in schoolhouses and are extremely toxic and threaten public health. Information provided by Monsanto during or after manufacture of PCBs has been inadequate and/or false and misleading.

98.     Monsanto's PCBs have contaminated schools in Vermont, including BHS, causing harm to the children, students, teachers, staff members, contractors, occupants, and others of the school, including the Plaintiffs. This was not only reasonably foreseeable, but it was known to Monsanto that such harm would come to third parties such as the Plaintiffs. Accordingly, the Plaintiffs seek compensatory and punitive damages against Monsanto.

99.     It was also reasonably foreseeable, based on Monsanto's history and experience with PCB customers and users, that some inspectors, owners, operators, providers, or maintainers of buildings would engage in negligent conduct that would result in harm to innocent third parties, such as teachers and schoolchildren, by exposing them to Monsanto's PCBs.

100.    Monsanto's PCBs continue to contaminate schools built and/or renovated before 1980, including BHS, because Monsanto intentionally produced and promoted PCBs in a variety of construction applications. As a result of this conduct, it was reasonably foreseeable that PCBs would be incorporated in buildings and would contaminate classrooms used by people, including the Plaintiffs, causing them damages. Monsanto's PCB contamination of BHS was a legal cause of injury to the Plaintiffs.

101.    Monsanto has had unique and vital information relating to PCBs that it has concealed, diminished, and/or suppressed from the public including: strategies to mitigate PCB risks; scientific data manipulation related to the detrimental impact of PCBs on human health; internal responses to the allegations made by the cities of San Diego, San Francisco and Spokane and other cities and schools in their lawsuits against Monsanto; facts regarding approximately 700 lawsuits for PCB pollution; internal views on certain publications and articles; and the IBT laboratory scandal launched by a former Monsanto employee who Monsanto coddled, used, benefitted from, and then re-employed by Monsanto.

102.    Bayer AG, since its acquisition of Monsanto, has ratified, encouraged, endorsed, and benefited Monsanto's fraud, engaged in its own tortious conduct independently, and/or promoted the wrongful conduct of Monsanto.

103.    As specified by the EPA, "occupants in schools with interior PCB sources will be exposed to PCBs in the indoor air, dust, and on surfaces through their normal activities." For the Plaintiffs and others in such school buildings, "exposures will occur through inhalation, ingestion, and dermal contact." EPA (2014) at 16.

104.    BHS was built in 1964. In November of 2018, BHS was approved for a major renovation project. BHS Re-Envisioning Project Information and Timeline, September 29, 2020. A Phase I Environmental Assessment ("ESA") is a standard early step in the process when planning a major construction or renovation of a facility. In February of 2019, the BHS School Board began taking Phase I ESA proposals. *Id.*

105.    In late April 2019, the first ESA at BHS was conducted internally by BHS. No sampling or testing at BHS was performed at this time. There was enough information collected, however, to justify sampling and testing for PCBs.  ATC Phase I ESA Report (April 26, 2019).

106.    The Phase II ESA report for BHS, issued in mid-July 2019, stated:

The presence of PCBs in soil constitutes a release in accordance with 35-102(b)(5) of iRule which should be reported to the Waste Management and Prevention Division (WMPD).

Any renovation involving soils beneath the Building F elevator pit be conducted pursuant with a soil handling plan including details on worker protection and disposal practices.

ATC Phase II ESA Report (July 15, 2019). The Phase II report addressed "Development Soils" (a/k/a "Urban Soils"). The Development soils section concludes: "The samples that exceed the VT Urban BSS and non-residential VSS constitute a release in accordance with 35-102(b)(5) of iRule

which should be reported to WMPD. As per iRule procedures, a complete site investigation should be conducted to adequately define the degree and extent of contaminants on-site. The site investigation should be supported by engineered cut and fill plans." *Id.*

107.    After continued sampling at BHS, the Burlington Construction Oversight Committee met multiple times to discuss the findings. Specifically, PCBs had been detected in building material, "found mostly in window caulking." BCOC public meeting presentation (November 11, 2019). The presentation stated that "PCBs have leached into masonry and are at actionable levels." *Id.* at Slide 12. BCOC began to consider engaging a third-party environmental consultant to provide a second opinion and analysis of the sampling already done and review the work plans.

108.    In mid-July 2020, BHS received a report showing PCB levels at BHS in every building at the school. ATC PCB Substrate Core Sampling Results (July 17, 2020). The BHS reconstruction project team decided that the current campus was too contaminated to renovate and opted for finding an entirely new location for the school. This finding was made public by April Barton, *Burlington abandons contaminated high school in favor of constructing new building*, Burlington Free Press (May 5, 2021).

109.    The Plaintiffs, public, staff, parents, and children were unaware of the actual toxic contamination of PCBs within the school buildings at BHS.

110.    Plaintiff Rubman's classroom was in building F, and recent reports show that this building had the highest levels of PCB exposure. Plaintiff Rubman has suffered symptoms and injuries due to her working environment at BHS. Specifically, Plaintiff Rubman has suffered a multitude of reproductive issues since beginning her work at BHS. In 2016, Plaintiff Rubman gave

birth two weeks early to an underweight child. At less than a year old, this child has exhibited signs of gastrointestinal issues.

111.    In November of 2017, Plaintiff Rubman suffered an incomplete miscarriage of twin fetuses and an endometrial extraction was required. After the miscarriage, Plaintiff Rubman commenced treating with a miscarriage therapist, which was ongoing when she suffered another miscarriage in May of 2018.

112.    In the fall of 2018, Plaintiff Rubman became pregnant again. However, in early October, the unborn child was diagnosed with Fetal Hydrops, which worsened over time. By the end of October, Plaintiff Rubman had to endure planned termination of the pregnancy at 16 weeks of gestation. After the procedure was performed, Plaintiff Rubman required medical intervention to stop her hemorrhaging.

113.    In August of 2019, Plaintiff Rubman gave birth to her second child prematurely. In addition, in 2020, Plaintiff Rubman was diagnosed with hyperthyroidism.

114.    Plaintiff Lothian's classroom was in building F as well, and reports show that this building had the highest levels of PCB exposure. Plaintiff Lothian has experienced a multitude of symptoms and physical injuries during her time working at BHS and since retiring.

115.    Plaintiff Lothian has suffered and continues to suffer from severe personal injuries, including cognitive issues. Her cognitive impairments include memory loss, confusion, and brain fog.

116.    All of Plaintiffs' injuries and damages are due to, caused by, and/or a substantial factor of exposure to PCBs at BHS, with Defendants jointly, severally, and independently responsible and liable for the same.

## COUNT I – STRICT LIABILITY

117.    Plaintiffs reassert the allegations in the foregoing paragraphs as if fully set out herein.

118.    Monsanto's PCBs were defective products in that they were defectively designed, tested, manufactured, labelled, distributed, and warned about, such that Monsanto's PCBs were unreasonably dangerous at the time they left Monsanto's control, and that through Monsanto's concealed knowledge of the hazardous nature of PCBs and inability to contain PCBs during foreseeable use of PCBs and PCB-containing products and applications, as well as the foreseeable environmental pollution, dispersal, and/or fate and transport of the same by Monsanto and by its customers, Monsanto's PCBs ultimately made their way into BHS and into Plaintiff Rubman and Plaintiff Lothian's bodies.

119.    A reasonable person or company with knowledge of the potential of PCBs to cause injuries to human beings would conclude that they should not have been manufactured, distributed, marketed, promoted, and sold as a product, component for a product, or for the products of which they were incorporated.

120.    A reasonable person or company who had knowledge of the potential of PCBs to be unable to be contained would conclude that they should not have been manufactured, distributed, marketed, promoted, and sold.

121.    Monsanto was engaged in the business of selling PCBs. Monsanto manufactured, distributed, marketed, promoted, and sold PCBs despite such knowledge of health hazards in order to maximize its profits regardless of injuries to human beings.

122.    Because of the persistence of PCBs, those PCBs to which Plaintiffs were being exposed were in substantially the same condition as when Monsanto sold them.

123.     Plaintiffs' environmental exposures to Monsanto's PCBs were a substantial factor and/or contributing cause in PCBs accumulating in their bodies, resulting in their developing multiple injuries.

124.     Plaintiffs Rubman and Lothian have suffered the injury of PCBs into and within their bodies, and have sustained physical and personal injuries, severe emotional distress, and have incurred and will continue to incur economic and non-economic losses, including those incurred in treating their diagnosed injuries, and in seeking to protect themselves and their families from the onset of other diseases known to be associated with PCB exposures. Defendants' conduct was willful, wanton, grossly negligent, and/or in reckless disregard for the Plaintiffs' rights, thereby justifying an award of punitive damages against the Defendants

## COUNT II – NEGLIGENCE

125.     Plaintiffs reassert the allegations in the foregoing paragraphs as if fully set out herein.

126.     Defendants owed Plaintiffs a duty of reasonable care.

127.     Defendants' manufacturing, marketing, labelling, packaging, and distribution of its various PCBs were negligent. As described above, for decades, Monsanto was aware of the hazards of PCBs, and either knew or should have known that its PCBs would be released into the environment or absorbed within an enclosed system such as a school building and its occupants.

128.     Despite this actual and constructive knowledge, Monsanto continued to market and sell its PCBs aggressively. Defendants' ongoing negligence caused or contributed to cause the Plaintiffs' exposure to PCBs, the accumulation of PCBs in their bodies, their personal injuries, their severe emotional distress, and/or their economic and non-economic damages. Defendants'

conduct was willful, wanton, grossly negligent, and/or in reckless disregard for the Plaintiffs' rights, thereby justifying an award of punitive damages against the Defendants.

## COUNT III – FAILURE TO WARN

129.    Plaintiffs reassert the allegations in the foregoing paragraphs as if fully set out herein.

130.    Plaintiffs allege that Defendants' knowledge of the dangers inherent in PCBs at the time Defendants manufactured and sold PCBs created a non-delegable duty to warn the Plaintiffs, the public, and Defendants' own customers. Defendants knew or should have known that PCBs were dangerous to an extent beyond that which would be contemplated by an ordinary consumer and/or an innocent school teacher. Despite this actual knowledge of the inherent dangers of its products, Defendants have made no attempts to warn the public, the Plaintiffs, or BHS of the health hazards and toxicity of PCBs. To the contrary, Defendants have taken every means possible to attack the science, undermine the science, ignore the EPA's findings on PCBs, conceal the facts from the public, and allow innocent children and school teachers to be exposed to PCBs in school houses, including BHS and the Plaintiffs Rubman and Lothian.

131.    Defendants' failures to warn to take the precautions that a reasonable person would in the same or similar circumstances constitutes negligent failure to warn. Moreover, Defendants' failures to warn render Defendants' PCB products defective in their representation, sales, distribution, and permitted uses.

132.    The dangers and toxicity of PCBs are not and were not obvious or known by foreseeable product users, and not schoolteachers or the Plaintiffs. Users of PCBs and school teachers, including the Plaintiffs, to their detriment, reasonably relied upon Defendants' failures to warn and Defendants' subterfuges regarding PCBs.

133.    As a proximate cause of Plaintiffs' exposure to Defendants' PCBs and Defendants' failures to warn, Plaintiffs sustained and will continue to sustain injuries and damages as set forth herein. Defendants' failures to warn were willful, wanton, grossly negligent, and/or in reckless disregard for the Plaintiffs' rights, thereby justifying an award of punitive damages against the Defendants.

## COUNT IV – MISREPRESENTATION

134.    Plaintiffs reassert the allegations in the foregoing paragraphs as if fully set out herein.

135.    Monsanto was aware of the hazards, risks, and fate and transport of PCBs, and either knew or should have known that its PCBs would be released into the environment or absorbed within an enclosed system such as a school building. Monsanto had a duty to disclose the dangers of PCBs.

136.    Despite this knowledge, Monsanto never disclosed or otherwise informed its customers, BHS, the public, or the Plaintiffs of the inherent dangers and toxicity of PCBs. Monsanto actively and/or negligently concealed and/or omitted material facts as to what Monsanto knew and when it knew about the toxicity, exposure, fate, transport, hazards, and risks of PCBs. Monsanto continued to promote and sell its PCBs without disclosing the truth of their dangers. Monsanto concealed for many years its knowledge of PCBs. The Plaintiffs Rubman and Lothian reasonably relied upon Monsanto's omissions of material facts and failures to disclose to the detriment of the Plaintiffs. As a proximate cause of said reliance, Plaintiffs have suffered the injuries and damages as alleged herein. Defendants' misrepresentations were willful, wanton, grossly negligent, and/or in reckless disregard for the Plaintiffs' rights, thereby justifying an award of punitive damages against the Defendants.

## COUNT V – SPOLIATION AND DESTRUCTION OF MATERIAL EVIDENCE

137.    Plaintiffs reassert the allegations in the foregoing paragraphs as if fully set out herein.

138.    Willful destruction of evidence gives rise to the presumption that the evidence, if produced, would have been injurious to the party who destroyed it.

139.    Monsanto was aware of the dangers of Aroclors and PCBs beginning in as early as the 1930s.

140.    Monsanto knew and acknowledged that PCBs should not be used around food because a) they did not have the data to support their safety to humans and b) Monsanto had no intention of spending money to get the data.

141.    At all relevant times, Monsanto concealed and destroyed material evidentiary documents, such as internal meeting notes, that directly show its knowledge of the dangers, risks, hazards, fate and transport of PCBs. Monsanto's destruction of its own internal documents is so outrageous as to constitute an independent tort of spoliation.

142.    As a proximate cause of Defendants' spoliation, the Plaintiffs here suffered the injuries and damages alleged herein. Defendants' spoliation acts were willful, wanton, grossly negligent, and/or in reckless disregard for the Plaintiffs' rights, thereby justifying an award of punitive damages against the Defendants.

### COUNT VI – LOSS OF CONSORTIUM

143.    Plaintiffs reassert the allegations in the foregoing paragraphs as if fully set out herein.

144.    At all times relevant to the allegations in this Complaint, Plaintiffs Tracy L. Rubman and James Ellery Baker have been married.

145.    As a contributing proximate cause of the tortious conduct and/or negligence of the Defendants, Plaintiff James Ellery Baker and has been deprived of the services, society, consortium and companionship of his spouse, Plaintiff Tracy L. Rubman has suffered severe emotional distress and loss of love, society, and companionship and is entitled to damages from the Defendants. Defendants' conduct was willful, wanton, grossly negligent, and/or in reckless disregard for these Plaintiffs' rights, thereby justifying an award of punitive damages against the Defendants.

## COUNT VII – CONSUMER PROTECTION

146.    Plaintiffs reassert the allegations in the foregoing paragraphs as if fully set out herein.

147.    Defendants intentionally produced and promoted PCBs "for use in a wide range of industrial and household goods, including electrical equipment, paint, sealants, food cookers, furnaces, floor wax, insecticides, lubricants, moisture-proof coatings, papers, asphalt, leather, adhesive, and stucco."

148.    Plaintiffs relied on those representations which were deceptive and likely to mislead consumers such as the Burlington School District, and the intended beneficiaries of its purchases, such as the Plaintiffs, in violation of the provisions of the Vermont Consumer Protection Statute, 9 V.S.A. Chapter 63.

149.    Plaintiffs have suffered adverse medical consequences, damages, personal injuries, and emotional distress as a direct result of Defendants' violation of the provisions of the Vermont Consumer Protection Statute.

150.    As a result, Plaintiffs were damaged and pray for the relief requested below including the exemplary damages provided by the Consumer Protection Statute.

## PRAYER FOR RELIEF

151.    WHEREFORE, a cause or substantial factor of the forgoing conduct and as to each and every Count alleged herein, the Plaintiffs demand a jury trial and seek and prays for the following relief from and against all Defendants individually, jointly, and severally:

a)    Compensatory damages for physical injury, pain, and suffering and mental and emotional distress, pain and suffering (past, present, and future);

b)    Medical expenses, including future medical monitoring and life care plan expenses;

c)    Lost wages, employment benefits, and income;

d)    Loss of enjoyment of life;

e)    Punitive damages;

f)    All other damages awarded at law or in equity;

g)    Attorneys' fees and costs;

h)    Pre- and Post-judgment interest; and

i)    All such other relief this Court deems just and fair.

DATED at Burlington, Vermont, this _5th_ day of October, 2022.

Respectfully submitted,

E. William Leckerling, Esq.
LISMAN LECKERLING, P.C.
84 Pine Street, 5th Floor
P.O. Box 728
Burlington, VT  05402
Tel:  (802) 864-5756
Fax:  (802) 864-3629
E-mail:  wmleckerling@lisman.com
*Attorneys for Plaintiffs Tracy L. Rubman;*
*James Ellery Baker; and Kathy A. Lothian*

CO-COUNSEL:

(to be admitted *pro hac vice*)

W. Wylie Blair #58196
**OnderLaw, LLC**
110 E. Lockwood, 2nd Floor
St. Louis, MO 63119
blair@onderlaw.com
(314) 963-9000 telephone
(314) 963-1700 facsimile

T. Roe Frazer II (TN BPR No. 35785)
**FRAZER PLC**
30 Burton Hills Blvd., Suite 450
Nashville, TN 37215
Telephone: (615) 647-6464
roe@frazer.law